FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

'97 APR 28 PM 1:42

U.S. DISTRICT COURT
N.D. OF ALABAMA

EDWARD NATHAN NORMAN, JR.,        )
                                  )
     Plaintiff,                   )         CIVIL ACTION NO.
                                  )
v.                                )         CV-96-AR-0339-S
                                  )
THE WACKENHUT CORP., et al.,      )
                                  )
     Defendants.                  )

**ENTERED**

APR 28 1997

**MEMORANDUM OPINION**

The court has before it two motions for summary judgment, one filed by defendant, The Wackenhut Corporation ("Wackenhut") and one filed by defendant, Brasfield & Gorrie General Contractor, Inc. ("B&G"). For the reasons set forth below, B&G's motion is due to be granted in its entirety and plaintiff's action as against B&G is due to be dismissed. Wackenhut's motion is due to be granted only with respect to plaintiff's claim for the tort of outrage, and denied as to plaintiff's remaining claims arising under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et. seq.*, ("Title VII"), and 42 U.S.C. § 1981.

### A. Pertinent Facts

Wackenhut hired plaintiff, Edward Nathan Norman, Jr. ("Norman"), a black male, as a Custom Protection Officer ("CPO"),

1

39

a security guard with some military or similar training, on or about November 29, 1994. Wackenhut's business consists of providing security services to its several customers, who currently include Bruno's supermarkets, Food Fair (which is apparently controlled by Bruno's), the Greyhound Bus Station, and B&G-- Wackenhut also provided security services for a time for Payless Shoe Stores ("Payless"). Plaintiff was initially assigned to two Food Fair grocery store locations. For reasons that are in dispute, plaintiff was transferred from these assignments to provide security services at a construction site ("the site") where B&G was the general contractor. In addition, there were numerous subcontractors and subcontracting companies who worked at the site.

The general environment at the site was far from pleasant. While working at the site, plaintiff apparently observed writings on the chemical toilets and the walls that included references to the "KKK" and also included the word "Nigger". In the course of working, plaintiff also came across hangman's nooses and a cardboard cutout that was apparently meant to resemble a black person hung in effigy ("the effigy"). Plaintiff also saw posted on the interior of a trailer, to which only B&G employees and Wackenhut guards had access, a racist joke. No one, including plaintiff, has proffered any evidence relating to who wrote the

2

offensive words, posted the joke, or hung the nooses or effigy. Plaintiff further testified that none of the persons who did these things ever directly confronted him. There is no evidence that plaintiff was directly or personally targeted by the person or persons who produced the offensive material. Indeed, there is evidence to support the contention that the site was generally rowdy and that all persons, including white supervisors, were the subject of uninvited joking and criticism. (Rauckman Depo. at 43-44). Plaintiff also complains that one of his Wackenhut supervisors, a Captain Bailey, offered to tell him a racist joke. The evidence reflects that plaintiff refused, and walked away before the joke was told.

   Plaintiff reported his concern and discomfort about the situation to a supervisor, Captain Dan Jenkins ("Jenkins"), and to other Wackenhut personnel. Jenkins complained to B&G personnel about the jokes and writing and showed B&G personnel, specifically B&G foreman Fred Rauckman ("Rauckman"), the effigy and nooses which were promptly taken down and thrown away. Rauckman informed plaintiff that there was nothing more he could do other than throw the effigy away. (Pl. Depo. at 155). B&G had a meeting with its employees and told them that such conduct was unacceptable. However, Edward Nathan Morgan, a B&G superintendent, testified that

3

such meetings and admonishments would only make the situation worse. There is evidence that the writings on the walls were often painted over, but there is other evidence that some of the graffiti was not removed. (Morgan Depo. at 27-30; Rauckman Depo. at 27; Medley Depo. at 99). Accordingly, viewing the evidence in the light most favorable to plaintiff, the court will proceed as if some graffiti was remained.

After the incident concerning the effigy, plaintiff sought a transfer away from the site. He was reassigned to Payless. Payless eventually canceled its account with Wackenhut. Wackenhut claimed that the only job it then had available for plaintiff was at the construction site he had previously left. He returned to the site, and allegedly the same types of racially charged material was still visible. (Pl. Depo. at 110). Plaintiff and an officer Dale Blair, apparently saw two additional hangman's nooses at the site on March 2, 1995, after plaintiff's return. (Pl. Aff. at ¶ 25).

The facts surrounding plaintiff's discharge are controverted. Plaintiff claims that he was discharged, whereas Wackenhut asserts that plaintiff quit. Apparently, plaintiff, after some controversy between plaintiff and his supervisor, was relieved of his weapon and told to go home. The evidence shows that B&G had no direct

4

knowledge or input into plaintiff's discharge.

The undisputed facts show that Wackenhut was plaintiff's employer and that B&G was not. The facts further reflect that plaintiff worked at a number of job sites and was transferred between these job sites by Wackenhut. While plaintiff worked at the B&G site, B&G told Wackenhut what areas of the site needed to be patrolled, how many guards were needed, and when the buildings should be monitored. (Morgan Aff. at ¶ 10). Furthermore, B&G managers reviewed the logs of the security guards. It is undisputed that B&G contracted with Wackenhut for a certain caliber of guard, the CPO, and that the fee paid to Wackenhut was commensurate with the quality of the guard provided. The contract between Wackenhut and B&G specifically stated that the security guards were to be employees of Wackenhut, an independent contractor. (Nevins Depo. Ex. 3, at ¶ 4).

### B. Standard of Review

Rule 56 states, in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitle to judgment as a matter of law.

F. R. Civ. P. 56(c). As stated by the Eleventh Circuit, "[s]ummary

judgment is appropriate where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994). Defendants have moved for summary judgment on all of plaintiff's claims.

## C. Legal Analysis

### 1. B&G's Title VII and § 1981 Liability

B&G argues that it is not now, nor has it ever been, plaintiff's "employer" as that term is defined in Title VII and 42 U.S.C. § 1981.[1] This court agrees. In *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350 (11th Cir. 1994), a hotel owner which hired a management service and through it one of the management service's employees, paid the plaintiff/employee's salary, retained significant control over hiring decisions and maintained ultimate authority and control over any labor negotiations with employees,

---

[1] Title VII only allows plaintiff to sue an "employer" for alleged discriminatory conduct. While commonly asserted together, 42 U.S.C. § 1981 provides a separate and distinct cause of action. Section 1981 prohibits public or private racial discrimination, but only insofar as this discrimination relates to the formation and enforcement of contracts. *See Winbush v. State of Iowa*, 66 F.3d 1471, 1476-77 (8th Cir. 1995); *Fitzgerald v. Mountain States Telephone and Telegraph Co.*, 68 F.3d 1257, 1263 (10th Cir. 1995). For the purposes of this action the contractual link disputed is the employer/employee relationship. The determination of whether defendant is an "employer" for purposes of Title VII will, for the issue currently before the court, be determinative of the § 1981 claim.

6

was considered to be a Title VII employer. *Id.* at 1360. In this case, B&G hired an independent contractor, Wackenhut, to provide security for its construction project site. B&G did not sufficiently control any aspect of plaintiff's employment such that B&G could be considered a "joint employer" under the *Virgo* rationale.

"A 'joint employer' relationship is different from, though sometimes confused with, a 'single employer situation." *Virgo*, 30 F.3d at 1360 n.6. (citing *Clinton's Ditch Co-op. Co., Inc. v. National Labor Relations Bd.*, 778 F.2d 132, 137 (2d Cir. 1985), *cert. denied,* 479 U.S. 814, 107 S. Ct. 67 (1986)).

> A single employer situation exists where two nominally separate entities are actually part of a single integrated enterprise so that, for all purposes, there is in fact only a "single employer." *Browning-Ferris Industries,* 691 F.2d at 1122. The single employer standard is relevant when separate corporations are not what they appear to be, that in truth they are but divisions or departments of a "single enterprise". *See NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402, 80 S. Ct. 441, 443, 4 L. Ed. 2d 400 (1960).
>
> In contrast, in a "joint employer" relationship, there is no single integrated enterprise. A conclusion that employers are "joint" assumes that they are separate legal entities, but that they have merely chosen to handle certain aspects of their employer-employee relationships jointly. *Browning-Ferris Industries,* 691 F.2d at 1122.

*Clinton's Ditch Co-op Co., Inc. v. National Labor Relations Bd.,*

7

778 F.2d 132, 137 (2d Cir. 1985), *cert. denied,* 479 U.S. 814, 107 S. Ct. 67 (1986) (internal quotation marks omitted). Factors commonly utilized in determining joint employer status include: (1) interrelation of operations of the two independent companies; (2) centralized control of labor relations; (3) common management; and (4) common ownership of financial control. *See Virgo,* 30 F.3d at 1359-60 n.6; *McKenzie v. Davenport-Harris Funeral Home,* 834 F.2d 930, 933 (11th Cir. 1987)("The predominant trend in determining whether two businesses should be treated as a single or joint employer under § 2000e(b) is to apply the standards promulgated by the National Labor Relations Board (NLRB).")(citing cases); *Armbruster v. Quinn,* 711 F.2d 1332, 1337 (6th Cir. 1983)(citing cases). "While each factor is indicative of interrelation and while control over the elements of labor relations is a central concern, the presence of any single factor in the Title VII context is not conclusive." *Armbruster,* 711 F.2d at 1337. Accordingly, a "facts and circumstances" test, rather than a rigid application of the standards, is often employed to effectuate Title VII's liberal and remedial purpose. *See id.* at 1336-38.

In the present case, even a liberal application of the standards cannot allow this court to find that B&G and Wackenhut

8

were "joint employers." There is no evidence at all showing that there was common management, common ownership or financial control of the separate entities, B&G and Wackenhut. In the same vein, there was no centralized control of labor management.

> In the labor law field from which it is drawn, this phrase ["centralized control of labor management"] has reference to the existence, or lack thereof, of a single source which controls or has the authority to control various labor related matters, such as hiring and firing of employees, wage scales and conditions of work, for two or more nominally distinct entities. As applied in the context it would require a finding that [B&G] either made, or had the authority to make, decisions of that nature both for its own employees and for those of [Wackenhut].

*Massey v. Emergency Assistance, Inc.*, 580 F. Supp. 937, 942 (W.D. Mo. 1983), *aff'd,* 724 F.2d 960 (8th Cir. 1984), *cert. denied,* 469 U.S. 93, 105 S. Ct. (1984). These cases recognize that where one business entity contracts with another business entity to provide services or personnel, the first entity may not avoid employer liability <u>where it maintains sufficient control over the personnel to affect the terms and conditions of employment</u>. *See Virgo,* 30 F.3d at 1360 (citing *National Labor Relations Board v. Browning-Ferris Industries,* 691 F.2d 1117, 1122 (3d Cir. 1982)).

Here no such sufficient control exists. Plaintiff argues that B&G had "control" over plaintiff because: (1) B&G paid for services

9

provided by Wackenhut according to the caliber of security guard; (2) the guards "reported" to B&G supervisors; and (3) B&G had control over plaintiff's termination.

The fact that B&G by contract, paid for security guards according to the caliber of the guards supplied in no way suggests that it was directly controlling the employees's salaries-- though indirectly some subcontractor's employees are paid by the contractor. B&G was simply paying for high quality security officers. Second, there is no evidence that Wackenhut guards "reported" to B&G's supervisors in any meaningful sense. The B&G supervisors reviewed the logs to ensure that the guards were making their appointed rounds and B&G told the guards what areas needed to be patrolled. B&G hired Wackenhut to provide security. It would do B&G no good to have the security officers patrolling non-problem areas. Furthermore, it would do B&G no good to have the guards not patrol at all--so B&G did check to make sure they were patrolling. The alleged "control" exercised by B&G employees over plaintiff does not rise to the level of the "joint-employer" in *Virgo* or in any other cases this court can find. Wackenhut, not B&G, had virtually complete control over plaintiff. Wackenhut could transfer its employees from job site to job site apparently at will, it paid the employees, it hired and fired the employees, and

10

from the evidence, it offered substantial supervision at the job sites.

Finally plaintiff argues that B&G controlled the ability to terminate plaintiff. The argument is unconvincing. Plaintiff contends:

> [T]he record clearly reflects that B&G had both the explicit and implicit right to affect [plaintiff's] employment up to and including termination. For, if Wackenhut is to be believed, a simple complaint by a customer, such as B&G, could cause the plaintiff to be transferred to another location, and if such a location is unavailable, to be relieved of his position altogether.

(Plaintiff's Brief at 24-25). From what the court can surmise, plaintiff's syllogism is as follows: (1) if B&G complained about plaintiff's job performance plaintiff could be fired; (2) the right to complain is tantamount to the right to terminate; (3) the right to terminate is the right to control; (4) the right to control evidences an employer/employee relationship; therefore (5) B&G is plaintiff's employer. If this were correct, then any customer or buyer of services (who also is someone else's "employer" for Title VII purposes) who complains about poor quality service resulting in the firing of a service employee, is potentially subject to Title VII liability as that person's employer. The court is unwilling to adopt such an attenuated position.

Plaintiff also contends that B&G should be liable, not as an "employer", but rather because B&G allegedly interfered with plaintiff's employment relationship with Wackenhut. To support this contention, plaintiff cites *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338 (D.C. Cir. 1973), and its qualified adoption by the Eleventh Circuit in *Pardazi v. Cullman Med. Cent.*, 838 F.2d 1155, 1156, 1157 n.1 (11th Cir. 1988), and *Zaklama v. Mt. Sinai Med. Cent.*, 842 F.2d 291, 294 (11th Cir. 1988). Those cases, in essence, recognize a Title VII disparate treatment cause of action against an "employer" who "otherwise discriminate[s] against <u>any individual</u> with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin," even when the "individual" was not employed by the employer. *See Zaklama,* 842 F.2d at 294; *Pardazi,* 838 F.2d at 1156; 42 U.S.C. 2000e-2(a)(1) (1997). These cases have arisen in the context where one "employer" interferes with an employment relationship or employment opportunities between some individual and his employer or potential employer. In *Pardazi,* defendant hospital's alleged discriminatory denial of staff privileges to plaintiff--who was not its employee-- constituted a possible violation of 2000e-2(a)(1) because the

12

denial interfered with plaintiff's employment contract with another professional corporation that conditioned plaintiff's employment on his receipt of staff privileges at the hospital. *See Pardazi*, 838 F.2d at 1155-56. In *Zaklama*, a physician was discharged from his position as a resident doctor by his employer, Jackson Memorial Hospital, because of adverse recommendations of physicians of defendant's hospital. In both cases no direct employer/employee relationship was required to find defendant liable under Title VII for disparate treatment.

In the present case no interference with plaintiff's employment contract with Wackenhut has been shown. Rather, plaintiff complains of racial harassment by some as of yet unidentified person[s]. Plaintiff's claims against B&G, and to a significant extent against Wackenhut, are premised upon those entities' failure to effectively stop, and alleged failure to attempt to stop, the racially offensive conduct by those unknown persons. There is no showing, however, that B&G either directly or indirectly interfered at all with plaintiff's work contracts. It is true that B&G could, to a certain degree, control the operations of the contracting cite. Even so, numerous independent contractors, each with their own employees under their control,

also had access to that cite. Aside from telling those independent contractors what needed to be built, guarded, or installed, there is no evidence that B&G had any greater control over those independent contractor's employee's actions. If plaintiff were successful at imputing liability to B&G under the facts of this case, this court would have to rethink and rework all it currently knows about the law of independent contractors, because all general contractors would be potential employers of its independent contractor's employees.

A strict construction of *Pardazi* and *Zaklama* would not allow this court to extend the reasoning of those cases to the present controversy because there is no evidence that B&G directly interfered with plaintiff's employment contract or opportunities in any way. Accordingly, B&G's motion for summary judgment as to plaintiff's Title VII and § 1981 claims is due to be granted. The court notes, however, that the employment structure at issue in this case is odd. <u>If</u>, and only <u>if</u>, B&G were plaintiff's employer, there may be enough evidence to proceed past the summary judgment stage, as to B&G. See *Sparks v. Regional Med. Cent. Bd.*, 792 F. Supp. 735, 738 n.1 (N.D. Ala. 1992) (citing 29 C.F.R. § 1604.11(e)) wherein the court found that an employer could be found liable to

14

its employee for the harassing acts of an independent contractor that the employer had hired. This is not the situation here.

### 2. Wackenhut's Title VII and § 1981 Liability

The court determines that plaintiff has presented sufficient evidence to proceed to a jury on his Title VII and § 1981 claims against Wackenhut. Accordingly, Wackenhut's motion for summary judgment on those issues is due to be denied.

### 3. Outrage

Plaintiff not only alleges Title VII and § 1981 claims against defendants, B&G and Wackenhut, but also alleges claims of outrage. To recover for Alabama's tort of outrage, plaintiff must show:

> (1) the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from its conduct;
>
> (2) the defendant's conduct was extreme and outrageous; and
>
> (3) the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it.

*Patterson v. Augat Wiring Systems*, 944 F. Supp. 1509, 1525 (M.D. Ala. 1996)(citing *Jackson v. Alabama Power Co.*, 630 So. 2d 439, 440 (Ala. 1993)). This tort is reserved for only the most unsavory of acts that are "beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id*. "Mere insults, indignations, threats, annoyances,

15

petty oppression, or other trivialities do not constitute outrageous conduct." *Id.* (quoting *Surrency v. Harbison*, 489 So. 2d 1097, 1105-06 (Ala. 1986)). To date, the Alabama Supreme court has found that only three types of cases fall within the scope of outrage. The first relates to wrongful conduct related to family burials, the second relates to coercive and barbaric insurance tactics, and the third relates to cases of "egregious sexual harassment." *Id.* at 1525-26 (citing *Thomas v. BSE Indus. Contractors, Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993)). For purposes of this motion, this court will assume that the Alabama Supreme Court would extend the scope of the tort to cover egregious racial harassment. The court will further assume that the elements of the tort have been met with respect to conduct of the unknown individuals of which plaintiff complains. The question then becomes can Wackenhut or B&G be liable for this outrageous conduct.

In *Busby v. Truswal Systems Corp.*, 551 So. 2d 322, 328 (Ala. 1989), the court found that where an employee is not acting in the line and scope of his employment when committing harassment, and where the employer does not ratify the conduct of the employee, the employer cannot be held liable for the tort of outrage. "The tort of outrage carries punitive damages, which should not ordinarily be

16

imposed against an employer for the personal sexual transgressions of its employees." *Id*. The district court in *Augat Wiring* found that while an employee was not acting within the line and scope of his employment or in furtherance of the employer's business when sexually harassing plaintiff, the employer had ratified the employee's conduct and therefore could be liable for the tort of outrage. *Augat Wiring*, 944 F. Supp. at 1526-27. The ratification occurred because the management was aware of the harassment, because the management knew or should have known the employee's conduct constituted a tort, and because it took no effective action to remedy the problem. *Id*. at 1527.

In this case however, it would be impossible for either B&G or Wackenhut to ratify the conduct when the egregious conduct was all perpetrated by unknown persons, save Captain Bailey's offer to tell a racist joke. There is no way to show that either of these defendants, in such a circumstance, acted intentionally to harm plaintiff in this case or ratified conduct that did. Simply because plaintiff has made a facial showing that Wackenhut might be liable for Title VII racial harassment, under an attenuated theory that Wackenhut could have possibly done more as plaintiff's employer to try to end the harassment, this alone could not allow

17

a jury to find that Wackenhut acted in such a way as to have committed outrage. Plaintiff has proffered no other evidence that would support this claim. Accordingly, plaintiff's outrage claim against both defendants is due to be dismissed, and defendants' motions for summary judgment on this issue are due to be granted.

A separate and appropriate order will be entered.

DONE this 21st day of April, 1997.

*/s/ William M. Acker*

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT COURT